UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
TERRE HAUTE DIVISION

| | | |
|---|---|---|
| DAVID L. FOOS, | ) | |
| *Plaintiff*, | ) | |
| | ) | |
| *vs.* | ) | 2:13-cv-00438-JMS-WGH |
| | ) | |
| TAGHLEEF INDUSTRIES, INC., | ) | |
| *Defendant.* | ) | |

## **ORDER**

Presently pending in this employment case are: (1) Plaintiff David Foos' Motion for Summary Judgment, [Filing No. 70]; and (2) Defendant Taghleef Industries, Inc.'s ("Taghleef") Cross-Motion for Summary Judgment, [Filing No. 82]. The Court held a hearing on the pending motions on September 11, 2015.

## I.
### STANDARD OF REVIEW

A motion for summary judgment asks the Court to find that a trial is unnecessary because there is no genuine dispute as to any material fact and, instead, the movant is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a). As the current version of Rule 56 makes clear, whether a party asserts that a fact is undisputed or genuinely disputed, the party must support the asserted fact by citing to particular parts of the record, including depositions, documents, or affidavits. Fed. R. Civ. P. 56(c)(1)(A). A party can also support a fact by showing that the materials cited do not establish the absence or presence of a genuine dispute or that the adverse party cannot produce admissible evidence to support the fact. Fed. R. Civ. P. 56(c)(1)(B). Affidavits or declarations must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant is competent to testify on matters stated. Fed. R. Civ. P. 56(c)(4). Failure to properly support a fact in opposition to a movant's factual assertion can result in the movant's

fact being considered undisputed, and potentially in the grant of summary judgment. Fed. R. Civ. P. 56(e).

In deciding a motion for summary judgment, the Court need only consider disputed facts that are material to the decision. A disputed fact is material if it might affect the outcome of the suit under the governing law. *Hampton v. Ford Motor Co.*, 561 F.3d 709, 713 (7th Cir. 2009). In other words, while there may be facts that are in dispute, summary judgment is appropriate if those facts are not outcome determinative. *Harper v. Vigilant Ins. Co.*, 433 F.3d 521, 525 (7th Cir. 2005). Fact disputes that are irrelevant to the legal question will not be considered. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L.Ed. 202 (1986).

On summary judgment, a party must show the Court what evidence it has that would convince a trier of fact to accept its version of the events. *Johnson v. Cambridge Indus.*, 325 F.3d 892, 901 (7th Cir. 2003). The moving party is entitled to summary judgment if no reasonable factfinder could return a verdict for the non-moving party. *Nelson v. Miller*, 570 F.3d 868, 875 (7th Cir. 2009). The Court views the record in the light most favorable to the non-moving party and draws all reasonable inferences in that party's favor. *Darst v. Interstate Brands Corp.*, 512 F.3d 903, 907 (7th Cir. 2008). It cannot weigh evidence or make credibility determinations on summary judgment because those tasks are left to the fact-finder. *O'Leary v. Accretive Health, Inc.*, 657 F.3d 625, 630 (7th Cir. 2011). The Court need only consider the cited materials, Fed. R. Civ. P. 56(c)(3), and the Seventh Circuit Court of Appeals has "repeatedly assured the district courts that they are not required to scour every inch of the record for evidence that is potentially relevant to the summary judgment motion before them," *Johnson*, 325 F.3d at 898. Any doubt as to the existence of a genuine issue for trial is resolved against the moving party. *Ponsetti v. GE Pension Plan*, 614 F.3d 684, 691 (7th Cir. 2010).

"The existence of cross-motions for summary judgment does not, however, imply that there are no genuine issues of material fact." *R.J. Corman Derailment Servs., LLC v. Int'l Union of Operating Engineers*, 335 F.3d 643, 647 (7th Cir. 2003). Specifically, "[p]arties have different burdens of proof with respect to particular facts; different legal theories will have an effect on which facts are material; and the process of taking the facts in the light most favorable to the non-movant, first for one side and then for the other, may highlight the point that neither side has enough to prevail without a trial." *Id.* at 648.

## II.
### BACKGROUND

The Court finds the following to be the undisputed facts, as supported by proper citation to admissible evidence in the record and viewed in the light most favorable to Mr. Foos:

### A. Taghleef Employee Handbook

Taghleef is a leading producer of packaging film for food and nonfood products. [Filing No. 82-1 at 1.] It operates several processing facilities, including one in Terre Haute, Indiana. [Filing No. 82-1 at 1.] Taghleef has an Employee Handbook which, in relevant part, provides:

> **This Handbook does not create a contract, express or implied, nor may it be construed to constitute contractual obligations of any kind between [Taghleef] and any of its employees.**

[Filing No. 70-1 at 166 (emphasis in original).]

> **Employment**
>
> Employment at [Taghleef] is at will in nature and may be terminated at any time, either by the employee or [Taghleef] with or without notice or cause. The Company strives to ensure that all employment phases are processed with thoughtfulness, respect, consistency, and legal compliance.

[Filing No. 70-1 at 174.]

- 3 -

**Personal Information**

                           *             *                *

Personal information includes medical reports such as condition reports and causes on illnesses and injuries.  Personal information is never to include genetic information or family medical history.  Personal information does not include public information that is lawfully made available to the general public.

No Company employee is to:

· Share another employee's personal information without documented permission of the other employee.

· Maintain other employees' personal information on any portable computer or storage device.

· Misrepresent another employee's identification to either gain access to or to give out personal information.

· Participate in a session with a vendor if other employee personal information is required to be given out or discussed without signed permission.

Violations of these requirements will likely lead to serious corrective actions.

                           *             *                *

Medical files are maintained in a separate locked area….  Access to the information in the files is restricted.

[Filing No. 70-1 at 187-88.]

**Health Information Assistance**

**Medical records are protected under HIPAA**

                           *             *                *

[Taghleef] benefit plans may share protected health information with each other to carry out treatment, payment, or healthcare functions.  Unless otherwise specified, these plans will be referred to as the Plan.

Privacy

The [Health Insurance Portability and Accountability Act ("HIPAA")] protects individuals from the unauthorized use or display of protected health information. Although some uses of this information do not need authorization, others require release forms. [Taghleef] is accountable to make employees aware of all of the aspects of HIPAA privacy regulations, including the penalties for committing privacy breaches.

**Patient Authorization**

An authorization form is to accompany any release of protected health medical information by an employee.

*              *              *

**Written Procedures**

HIPAA requires all employers who handle sensitive medical information to enforce proper security procedures. These security procedures prevent information access by unauthorized users. To satisfy HIPAA regulations, a written copy of HIPAA-based procedures contains information on how a company implements HIPAA policies, such as who is responsible for different aspects of security and methods of sharing privacy notices.

*              *              *

**The Plan's duties with respect to personal health information**

The Plan is required by law to maintain the privacy of health information and to provide a notice of the Plan's legal duties and privacy practices with respect to an individual's health information. If participating in an insured plan option, there will be a notice directly from the Insurer. It is important to note that these rules apply to the Plan, not [Taghleef] as an employer – that is the way the HIPAA rules work. Different policies may apply to other [Taghleef] programs or to data unrelated to the Plan.

**How the Plan may share the health information with [Taghleef]**

The Plan, or its health insurer or HMO, may disclose health information without written authorization to [Taghleef] for plan administration purposes.... [Taghleef] agrees not to use or disclose the health information other than as permitted or required by the Plan documents and by law.... In addition, [Taghleef] cannot and will not use health information obtained from the Plan for any employment-related actions. However, health information collected by [Taghleef] from other sources, for example under the Family and Medical Leave Act...is not protected under

- 5 -

HIPAA (although this type of information may be protected under other federal or state laws).

[Filing No. 70-1 at 252-55.]

**Drug and Alcohol Policy**

\*               \*               \*

Consumption:  The presence of Drugs and/or Alcohol Impairment when reporting to the Company Workplace or during any Scheduled and Non-Scheduled Work Time is prohibited and will result in employment termination.  If alcohol testing reveals the employee is Alcohol Influenced, the employee is sent home without pay and will not be permitted to work until the employee is alcohol free.

\*               \*               \*

**Consent**

A signed consent form authorizing the collection and testing of urine, blood, breath, hair, or saliva Specimens, and the release of the test results to the Company shall be placed in each employee personnel file.  An employee who refuses to sign the consent form or otherwise refuses to submit to testing when requested to do so will be subject to termination of employment.

\*               \*               \*

**Violations of this Policy**

\*               \*               \*

A positive Drug confirmation test or a positive Breath Alcohol Content impaired test will result in separation of employment.

\*               \*               \*

**Reasonable Suspicion Testing**

The Company may relieve an employee from the Scheduled Work Time and require the employee to be tested if there is evidence based [on] "reasonable suspicion" that an employee's performance is impaired by drugs or alcohol.

·    Suspicion based upon specific personal observations that the Company can describe concerning the employee's appearance, behavior, speech, breath, body odor, attendance, performance, or other physical signs of

possible Drug and/or Alcohol use.  The overall concern is the fitness for
duty and safety of employees and co-employees.

·   Suspicion based on the employee violating the Company's rules.

[Filing No. 70-1 at 285-290.]

### B.  Mr. Foos' Employment at Taghleef

#### 1.  *Extruder Operator Position*

Mr. Foos began working as a permanent employee at Taghleef in 2000,[1] and worked most

recently as an Extruder Operator at Taghleef's Terre Haute facility.  [Filing No. 71-2 at 19; Filing

No. 71-2 at 27-29.]  As an Extruder Operator, Mr. Foos operated the extruder, which melts plastic

pellets into a flat sheet which is then stretched in an oven.  [Filing No. 71-1 at 2; Filing No. 71-2

at 30.]  The extrusion process is described in this way:

> Film extrusion is accomplished through the use of heavy equipment that operates
> at very high rates of speed and at very high temperatures.  Foos worked in Tenter
> 63 where manufacturing temperatures rise to 220-240 degrees Celsius (428 F to
> 464 F) during the film-making process.  Production speeds range from 153 to 202
> meters per minute (501 feet to 663 feet per minute).  The processing lines contain
> massive rotating rolls and "in-running nip spots" where the rolls come together.
> The width of the resulting films is 5.5 meters (18 feet).  There are fork lifts and very
> heavy equipment on the manufacturing floor, and the finished products are wrapped
> on very large and heavy rolls that are moved around the plant floor.  As an Extruder
> Operator, Foos operated and was exposed to this equipment.

[Filing No. 82-1 at 2.]

The position of Extruder Operator had certain safety requirements to ensure that Mr. Foos

did not injure himself or his co-workers during extruder operation.  [Filing No. 71-1 at 2.]  Mr.

Foos wore safety glasses, steel-toed shoes, gloves, and earplugs while performing his job.  [Filing

---

[1] In 2000, Taghleef was called Applied Extrusion Technologies, Inc.  [Filing No. 82-2 at 5; Filing
No. 82-2 at 12-13; Filing No. 82-2 at 53.]

No. 71-2 at 30.] His job responsibilities included checking the process line for unusual or trouble-some conditions, troubleshooting line problems, correcting any problems, monitoring and/or re-claiming inventory, and adjusting the process feed as needed. [Filing No. 82-4 at 1-2.] He was also responsible for monitoring film quality, observing and correcting any deviation in production, and identifying nonconforming or off-spec products. [Filing No. 82-4 at 1-2.] His position also required him to comply with all safety standards, perform tasks using appropriate procedures and safeguards to prevent incident or injury, participate in activities established to advance safety per-formance, address housekeeping issues, and address any "at risk behavior" by other employees. [Filing No. 82-4 at 1.]

2. *Mr. Foos' FMLA Leave*

Linda LeCour is the Health and Wellness Manager at Taghleef, and her primary responsi-bilities are benefit administration (including short-term disability, family/medical leave, and long-term disability) and organizing health and wellness activities. [Filing No. 70-1 at 7-8.] During his employment at Taghleef, Mr. Foos requested and received continuous leave under the Family Medical Leave Act ("FMLA") for pancreatitis for the following time periods:

- October 4, 2009 through October 24, 2009;

- October 25, 2009 through November 19, 2009;

- July 28, 2011 through August 9, 2011;

- September 23, 2011 through October 23, 2011; and

- July 26, 2012 through September 16, 2012.

[Filing No. 82-5 at 11-12.]

On each of these occasions, Ms. LeCour approved Mr. Foos' FMLA leave.  [Filing No. 82-5 at 13.]  Additionally, on each of these occasions Mr. Foos returned to work at Taghleef without incident – to his same position and with the same pay and benefits as before his leave.  [Filing No. 82-2 at 110.

In April 2013, Mr. Foos requested and was granted FMLA leave to recover from a facial fracture and a deviated septum that he received during a fight that occurred at a bar.  [Filing No. 82-2 at 39-40; Filing No. 82-2 at 44-45; Filing No. 82-6 at 3-7.]  His leave lasted from April 22, 2013 to May 22, 2013, during which time he had surgery for his injuries.  [Filing No. 82-2 at 44; Filing No. 82-2 at 49.]

One week after returning to work from the fight-related injuries, Mr. Foos informed his supervisor at Taghleef, Dan McKee, that he was having problems with his "stomach or pancreas," and was going to the hospital so would not be at work for a few days.  [Filing No. 82-2 at 50; Filing No. 82-10.]  Mr. Foos requested FMLA and short-term disability leave beginning on May 29, 2013, for pancreatitis.  [Filing No. 82-6 at 8.]  On June 7, 2013, while Mr. Foos was still on FMLA leave, his treating physician, Dr. Frank Spendal, submitted a Short Term Disability Certification of Health Care Provider (the "Certification") on Mr. Foos' behalf.  [Filing No. 82-12.]  The Certification listed Mr. Foos' primary diagnosis as "acute alcoholic pancreatitis." [Filing No. 82-12.]  Prior to this Certification, no other medical documentation submitted to Taghleef in connection with Mr. Foos' previous FMLA leave requests had reflected that Mr. Foos' condition was related to or caused by alcohol consumption.  [Filing No. 82-5 at 14; Filing No. 82-25 at 3.]

### C.  Mr. Foos' Termination

*1.  Taghleef's Decision to Administer an Alcohol Consumption Test to Mr. Foos*

When Taghleef received the Certification, Ms. LeCour reviewed it and became concerned that, since alcohol use was contributing to his diagnosis of alcoholic pancreatitis, Mr. Foos might be consuming alcohol excessively and, perhaps, at work.  [Filing No. 82-5 at 24.]  Ms. LeCour did not have any indication, however, that Mr. Foos had ever been drinking at work or was a safety risk at work.  [Filing No. 82-5 at 24-25.]  Ms. LeCour was also concerned because Mr. Foos had a long history of pancreatitis episodes, and someone had mentioned to her that Mr. Foos had previously received injuries while in a fight at a bar.  [Filing No. 82-5 at 25-26.]  Ms. LeCour was concerned about the workplace safety implications if Mr. Foos was drinking alcohol at work, so she told Bryan Jackson, Taghleef's Human Resources Manager, about Mr. Foos' diagnosis of alcoholic pancreatitis in an email:

> We have an employee who suffers from chronic pancreatitis.  He is hospitalized 1 or 2 times a year for this condition, (9/2012, 10/2011, 8/2011, 10/2009).  His most recent admission was 5/29/13.  I just received the medical documentation from his physician for [short-term disability] and FMLA benefits.  His doctor documents that this employee's **medical diagnosis is "acute <u>alcoholic</u> pancreatitis."**  This is the first time his doctor has ever referred to his condition as "alcoholic" pancreatitis.
>
> Prior to this episode this employee was off work from April 22, 2013 through May 22, 2013 due to a fractured orbital bone (cheek bone) that required surgery.  Supposedly he got punched in the face during a bar fight.
>
> I really don't want to have a repeat of [another employee's] situation but I am concerned that this guy has some issues that could impact safety and productivity.

[Filing No. 82-13 at 1 (emphasis in original); *see also* Filing No. 82-5 at 27-28.]

Upon reviewing the information from Ms. LeCour, Mr. Jackson then recommended to Taghleef's Director of Operations, Larry Mauer, that Mr. Foos should undergo a drug screen and alcohol test.  [Filing No. 82-14 at 10; Filing No. 82-14 at 15; Filing No. 82-15 at 12.]  Mr. Mauer,

Mr. McKee, and Senior Operations Manager Tony Buck met on June 10, 2013, and discussed the diagnosis of "acute alcoholic pancreatitis" on the Certification, and also Mr. Foos' bar fight. [Filing No. 82-15 at 13-14.] Mr. Mauer and Mr. Buck discussed the matter further in a June 11, 2013 meeting. [Filing No. 82-15 at 16.] Mr. Mauer also discussed the situation with Taghleef's in-house counsel on June 11, 2013 and, after that meeting, determined that he had reasonable suspicion that Mr. Foos might return to work impaired or intoxicated based on the diagnosis of acute alcoholic pancreatitis and on the fact that Mr. Foos had been in a bar fight. [Filing No. 82-15 at 16-17; Filing No. 82-15 at 28.] As a result, Mr. Mauer decided that Mr. Foos would be sent for drug and alcohol testing upon his return from leave. [Filing No. 82-15 at 16.]

On June 12, 2013, Mr. McKee sent an email to Mr. Buck asking him how to handle the situation if Mr. Foos tested positive for alcohol. [Filing No. 82-16 at 1.] Mr. Buck responded:

> If he blows negative, he comes back to work. If he is positive, he needs to go home and not return until he hears from us. Regardless if he is below legal limit, we need to tell him he needs to find a ride home and do not let him drive home.

[Filing No. 82-16 at 1.]

In the past, Taghleef had tested other employees for drug and alcohol consumption, including:

- An employee whose outward appearance had changed drastically for the worse over time, and whose co-workers had made comments about the employee drinking excessively, [Filing No. 82-15 at 36];

- An employee whose co-workers reported their concern that the employee had been drinking too much, and who had fallen twice outside of work resulting in multiple bone fractures, [Filing No. 82-15 at 36-37]; and

- An employee who was late for work and admitted he had been drinking the night before and had been involved in a fight with his girlfriend resulting in both of their arrests, [Filing No. 82-21 at 1].

### 2. Mr. Foos' Breath Alcohol Test

Mr. Foos reported to work on June 15, 2013 at 5:30 a.m. for his 6:00 a.m. shift.  [Filing No. 82-2 at 72.]  He then reported to a pre-shift meeting.  [Filing No. 82-2 at 72.]  Shortly after the pre-shift meeting, Mr. McKee informed Mr. Foos that instead of going to the manufacturing line, Mr. Foos should report to Mr. McKee's office.  [Filing No. 82-2 at 73-74.]  Mr. McKee then told Mr. Foos that he would be taken to the hospital for drug and alcohol testing.  [Filing No. 82-2 at 74-76.]  When Mr. Foos asked why he had to undergo an alcohol consumption test, Mr. McKee referenced Mr. Foos' pancreatitis and the bar fight, and noted that they could be caused by alcohol. [Filing No. 82-2 at 76; Filing No. 82-22 at 1.]  Mr. Foos expressed concern with the drug screening, due to all of the medications he was on.  [Filing No. 82-22 at 1.]  On the way to the hospital, Mr. Foos informed Mr. McKee that he had consumed "quite a bit of beer" the day before, but said that he was done drinking and home in bed by 10:30 p.m.  [Filing No. 82-2 at 78; Filing No. 82-22 at 1.]

Upon arrival at the hospital, Mr. Foos gave a urine specimen for drug testing, and submitted to a breath alcohol test.  [Filing No. 82-2 at 80-84.]  The breath alcohol test was supervised by Medical Lab Tech Martha McAuliffe Copper.  [Filing No. 82-2 at 84; Filing No. 82-23 at 1.]  Ms. Copper filled out the breath alcohol test form and in a section entitled "Reason for Test" stated "Random."  [Filing No. 82-23 at 2.]  No one at Taghleef instructed her to mark "Random" as the reason for the test – rather, it was based on her asking Mr. Foos what the reason for the test was, to which he replied "[t]hey just want it."  [Filing No. 82-23 at 2.]  The first breath alcohol test, recorded at 7:36 a.m. on June 15, 2013, showed a blood alcohol level of .081.[2]  [Filing No. 82-23

---

[2] In Indiana, it is a class C Misdemeanor for an individual to operate a motor vehicle at a level above .08 blood alcohol content.  .08 BAC is often referred as the "legal limit."  Indiana Code 9-30-5-1.

at 1.]  The second breath alcohol test, recorded at 7:53 a.m. on June 15, 2013, showed a blood

alcohol level of .078.  [Filing No. 82-23 at 1.]  Mr. Foos and Ms. Copper both signed copies of the

form, and Mr. Foos was given a copy of the results.  [Filing No. 82-2 at 87-89; Filing No. 82-23

at 2.]  Mr. McKee communicated the results to Mr. Buck.  [Filing No. 82-17 at 22.]

    Mr. McKee then drove Mr. Foos back to Taghleef.  [Filing No. 82-17 at 29.]  He advised

Mr. Foos that he was being sent home, but was not permitted to drive home.  [Filing No. 82-2 at

89; Filing No. 82-17 at 29.]  On the way back to Taghleef, Mr. Foos told Mr. McKee that it was

not anyone's fault but his own for the breath alcohol test results.  [Filing No. 82-17 at 29.]  Mr.

Foos asked Mr. McKee to "look the other way" so that he could "just leave" instead of being driven

home.  [Filing No. 82-2 at 89; Filing No. 82-17 at 30-31.]  Mr. McKee told Mr. Foos that this

would be unacceptable.  [Filing No. 82-17 at 31.]  Mr. Foos then attempted to drive home, but was

stopped near a security gate where Mr. McKee met him.  [Filing No. 82-2 at 89-90; Filing No. 82-

17 at 31.]  Mr. Foos then contacted his girlfriend, who drove him home.  [Filing No. 82-2 at 91.]

    Mr. Buck sent Mr. Foos a letter on June 18, 2013, informing Mr. Foos that his employment

with Taghleef was terminated effective June 17, 2013, and stating:

> For a safety sensitive and legally compliant Workplace, Taghleef Industries strives
> to provide a workplace free of drugs and alcohol impairment.  An employee who
> receives a confirmed positive drug test, a positive alcohol impaired test, or refuses
> required testing is subject to termination of employment.
>
> Furthermore, the presence of drugs and/or alcohol impairment when reporting to
> the company workplace or during any scheduled and non-scheduled work time is
> prohibited and will result in employment termination.
>
> The alcohol test you submitted to on Saturday, June 15, was at a level that violates
> the Drug and Alcohol Policy for Taghleef Industries.
>
> Your employment at Taghleef Industries is hereby terminated, effective June 17,
> 2013.

[Filing No. 82-24.]

Since 2008, Taghleef has terminated seventeen employees for violation of its Drug and Alcohol policy – eight of whom did not take FMLA leave during their employment. [Filing No. 82-25 at 3.] Of the remaining nine terminated employees, two had taken FMLA leave within three months of their termination date. [Filing No. 82-25 at 3.]

### D.  The Lawsuit

Mr. Foos filed this lawsuit on December 20, 2013, alleging claims for: (1) discrimination on the basis of a disability; and (2) violation of the FMLA.[3] [Filing No. 1 at 4-5.] Mr. Foos stated in his Statement of Claims[4] that he claims that Taghleef violated the Americans with Disabilities Act, 42 U.S.C. § 12010, *et seq.*, as amended, ("ADA") because it: "(1) perceived [Mr. Foos] as disabled; (2) treated [Mr. Foos] differently than other employees returning from FMLA or [short-term disability] leave (including [Mr. Foos] himself) based upon the perceived disability; (3) subjected him to adverse employment action including, but not limited to, impermissibly sharing his confidential medical information and forcing him to submit to an unwarranted medical examination after having been released to return to work with no restrictions; and (4) the adverse employment actions were motivated by an impermissible retaliatory or discriminatory animus." [Filing

---

[3] Mr. Foos filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") on August 24, 2013, [Filing No. 1-3], and was informed by the EEOC on September 27, 2013 that it was "unable to conclude that the information obtained establishes violations of the statutes.  This does not certify that the respondent is in compliance with the statutes.  No finding is made as to any other issues that might be construed as having been raised by this charge," [Filing No. 1-4].

[4] On December 10, 2013, the Court modified its Uniform Case Management Plan to require the parties to set forth a statement of the claims or defenses it intends to prove at trial, stating specifically the legal theories upon which the claims or defenses are based following the completion of liability discovery.  The purpose of the statement is to require the parties to clarify and elaborate upon any legal theory stated in the initial pleadings to assist in preparation for either summary judgment or trial.

No. 64 at 2 (emphasis omitted).]  Mr. Foos also stated that Taghleef violated the FMLA by im-

properly "substitut[ing]" Mr. Foos' "confidential medical information and history of prior disabil-

ity leave…for 'reasonable suspicion.'"  [Filing No. 64 at 3.]

        The parties have each moved for summary judgment, [Filing No. 70; Filing No. 82], and

the Court will now consider the motions.

### III.
### DISCUSSION

### A.  ADA Claims

        At the outset, the Court notes that Mr. Foos' briefs exhibit some confusion regarding ex-

actly what claims he is asserting, and the elements of those claims – particularly his claims under

§ 12112(d).  The ADA contains a general prohibition against discrimination based on a disability,

42 U.S.C. § 12112(a), and several provisions related to medical examinations and inquiries that

give rise to claims which are distinct from an ADA discrimination claim.  *See Ward v. Merck &*

*Co., Inc.*, 2006 WL 83114, *7 (E.D. Pa. 2006) ("Medical inquiry claims, which are governed by

42 U.S.C. § 12112(d)(4), represent causes of action independent of disparate treatment and retali-

ation claims that accompany them").  Mr. Foos clarified at the September 11 hearing that he is

asserting claims under § 12112(d)(4)(A) and § 12112(d)(4)(C), and also a discrimination claim

under § 12112(a).  In his briefs, however, Mr. Foos misapplies the direct and indirect methods of

proof for a discrimination claim with the straightforward elements of his distinct claims under §

12112(d).[5]  The Court has done its best to identify which arguments relate to which of Mr. Foos'

claims, and addresses those arguments below.  The Court will first consider his claims under §

12112(d).

---

[5] The parties agreed at the September 11 hearing that Mr. Foos need not show discrimination under
the direct or indirect methods of proof to succeed on his § 12112(d) claims.

### 1. § 12112(d) Claims

Mr. Foos argues that Taghleef violated the ADA by disclosing his confidential medical information to Taghleef management for the purpose of taking an adverse employment action in violation of § 12112(d)(4)(C), and by forcing him to submit to "an unwarranted medical examination" – the breath alcohol test – in violation of § 12112(d)(4)(A).  [Filing No. 64 at 2; Filing No. 73 at 15.]

### a.   § 12112(d)(4)(C) – Disclosure of Medical Information

Mr. Foos argues that Taghleef violated § 12112(d)(4)(C) when Ms. LeCour disclosed his medical records to his supervisors.  [Filing No. 73 at 25-26.]  Taghleef disagrees, and also argues that Mr. Foos failed to exhaust his administrative remedies for this claim because he did not assert that Taghleef wrongfully disclosed his medical records in his EEOC Charge.  [Filing No. 83 at 33-35.]  Mr. Foos asserts on reply that his claim concerning the disclosure of his medical records is closely related to the claims asserted in his EEOC Charge and, therefore, he can assert it here.  [Filing No. 84 at 14-15.]  In its reply, Taghleef points to evidence which it argues indicates that Mr. Foos could have asserted a claim related to the disclosure of his medical information in his EEOC Charge, based on the information he knew at the time.  [Filing No. 87 at 8-9.]

### i.   Exhaustion of Administrative Remedies

Taghleef argues that Mr. Foos failed to exhaust his administrative remedies in connection with his ADA claim based on disclosure of his medical records because he did not include that claim in his EEOC Charge.  [Filing No. 83 at 33-35.]  Instead, Taghleef argues, Mr. Foos only mentioned in his EEOC Charge "allegations of disparate treatment and that he was subjected to a medical examination upon his return to duty."  [Filing No. 83 at 35.]

Mr. Foos argues that "because most EEOC charges are completed by laypersons rather than by lawyers, a Title VII plaintiff need not allege in an EEOC charge each and every fact that combines to form the basis of each claim in her complaint." [Filing No. 84 at 15.]  He asserts that he did not know at the time the EEOC Charge was filed that Ms. LeCour had shared his medical information with other Taghleef employees, or that Taghleef required the breath alcohol test based on reasonable suspicion, rather than as a random test as marked on the testing form. [Filing No. 84 at 15.]  He contends that "[t]he reasons for the medical examination and the facts surrounding how and why he was sent for drug and alcohol testing are reasonably related to the allegations of the EEOC charge." [Filing No. 84 at 16.]

Taghleef replies that Mr. Foos testified that Mr. McKee told him he knew about Mr. Foos' alcoholic pancreatitis diagnosis when he was sent for the breath alcohol test, and that the reason Taghleef marked for requesting the test on the test form is irrelevant. [Filing No. 87 at 8-10.] Taghleef also points out that Mr. Foos retained his current counsel after receiving his termination letter, and testified that he was represented by that counsel when he "went to the EEOC," so his argument that a layperson general completes EEOC Charges does not apply to him. [Filing No. 87 at 9-10.]

"'A plaintiff may pursue a claim not explicitly included in an EEOC complaint only if [his] allegations fall within the scope of the charges contained in the EEOC complaint.'" *Conley v. Village of Bedford Park*, 215 F.3d 703, 710 (7th Cir. 2000) (quoting *Cheek v. Peabody Coal Co.*, 97 F.3d 200, 202 (7th Cir. 1996)).  In order to determine whether Mr. Foos' allegations related to the disclosure of his medical records fall within the scope of his EEOC Charge, the Court must consider whether the allegations are "'like or reasonably related to'" the allegations contained in the Charge. *Conley*, 215 F.3d at 710 (quoting *Cheek*, 97 F.3d at 202).  Claims are considered

- 17 -

reasonably related when there is "a factual relationship between them." *Kersting v. Wal-Mart Stores, Inc.*, 250 F.3d 1109, 1118 (7th Cir. 2001). In other words, "the EEOC charge and the complaint must, at minimum, describe the *same conduct* and implicate the *same individuals*." *Cheek v. Western and Southern Life Ins. Co.*, 31 F.3d 497, 501 (7th Cir. 1994) (emphasis in original).

Mr. Foos stated in his EEOC Charge:

On June 15, 2013, when I returned from a medical leave, I was told by [Mr. McKee] that I needed to submit to drug and alcohol testing. The reason stated on both forms was marked as random. I requested a copy of the company's policy on drug and alcohol[] testing but those requests were denied. On June 18, 2013, Senior Operations manager, Tony Buck terminated me for testing positive for alcohol.

I believe that I was discriminated against based on my disability because my employer believed that my medical condition impaired my ability to perform the essential job functions and subjected [me] to a medical examination upon return to duty, in violation of the Americans with Disabilities Act, as amended.

[Filing No. 1-3 at 1.]

The parties do not dispute that the EEOC Charge does not mention the disclosure of Mr. Foos' medical records. Rather, they disagree regarding whether such a claim is reasonably related to the claims contained in the EEOC Charge. The Court finds that the disclosure of medical records claim is not reasonably related to the discrimination claim in the EEOC Charge, which relate solely to the requirement that Mr. Foos submit to a drug and alcohol test. While the disclosure of his medical records may have led to Taghleef's decision to require the test, a claim under § 12112(d)(4)(C) based on the actual disclosure of the records – and not on the requirement that he submit to the breath alcohol test – is separate and apart from what Mr. Foos included in his EEOC Charge. Further, the Court finds that issues related to the disclosure of Mr. Foos' medical records would not have been likely to come up during an EEOC investigation of his stated claims. *See Ajayi v. Aramark Bus. Servs., Inc.*, 336 F.3d 520, 527 (7th Cir. 2003) (in determining whether

- 18 -

claim is within the scope of an EEOC charge, court will "ask 'what EEOC investigation could reasonably be expected to grow from the original complaint?'").  The Court finds it unlikely that an EEOC investigation into the disclosure of those records would "reasonably grow" from the claims he did include in his EEOC Charge.

Additionally, the Court rejects any argument that if Mr. Foos did not know about the disclosure of his medical records, his failure to exhaust his administrative remedies is somehow excused.  Even if Mr. Foos did not know when he filed his EEOC Charge that his medical records had been disclosed, he has not pointed to any authority that would excuse him from exhausting his administrative remedies by filing a new Charge related to that specific claim, since that claim does not reasonably grow from the claims included in his original Charge.  *See Geldon v. South Milwaukee Sch. Dist.*, 414 F.3d 817, 819 (7th Cir. 2005) (must exhaust administrative remedies by filing EEOC Charge for all claims, unless they are "like or reasonably related to the allegations of the charge and growing out of such allegations").

The Court also rejects Mr. Foos' argument that because a layperson usually completes an EEOC Charge, that somehow excuses the requirement of including every claim in an EEOC Charge.  [*See* Filing No. 84 at 14-15.]  This argument has no application to Mr. Foos because he testified that he contacted his counsel after receiving his termination letter, and that he was represented in connection with his EEOC proceedings.  [*See* Filing No. 82-2 at 98 ("Q: After you received this letter, did you retain counsel? A: Yes."); Filing No. 82-2 at 100 ("Q: And you were represented by counsel when you went to the EEOC? A: Yes").]

Because Mr. Foos failed to exhaust his administrative remedies, his claim under §
12112(d)(4)(C) for improper disclosure of his medical records is not properly before the Court.[6]
In the interest of thoroughness, however, the Court will consider whether Taghleef is entitled to
summary judgment on such a claim if it were considered a part of his EEOC Charge.

### ii.      Mr. Foos' Claim Under § 12112(d)(4)(C)

Mr. Foos bases his ADA claim related to the disclosure of his medical records on §
12112(d)(4)(C), which provides that information obtained from a required medical examination
regarding an employee's medical condition must be kept confidential except that, among other
things, "supervisors and managers may be informed regarding necessary restrictions on the work
or duties of the employee and necessary accommodations." 42 U.S.C. § 12112(d)(4)(C) (incorpo-
rating by reference 42 U.S.C. § 12112(d)(3)(B)).  In order to succeed on a claim for violation of §
12112(d)(4)(C), Mr. Foos would be required to show that "[Taghleef] obtained his medical infor-
mation through employment-related medical examinations and inquiries, the information obtained
through such means was disclosed by the employer rather than treated as confidential (unless that
information falls under one of the exceptions founds in 42 U.S.C. § 12112(d)(3)(B)(i), (ii), (iii)…),

---

[6] To the extent Mr. Foos claims that Taghleef improperly disclosed his medical records and vio-
lated some other federal law outside of the discrimination context (*e.g.*, HIPAA), he would not be
required to exhaust administrative remedies to file such a claim.  The Court does not find any
indication in the filings that Mr. Foos is seeking relief under any laws other than the ADA and the
FMLA.  Additionally, Mr. Foos does not present any authority to support an argument that if Ms.
LeCour's disclosure of the medical records violated Taghleef policy as set forth in the Employee
Handbook, he would have a federal claim for such disclosure.  And, in any event, the disclosure
did not contradict procedures set forth in the Employee Handbook, which explicitly provides that
"health information collected by [Taghleef] from other sources, for example under the
[FMLA]…is not protected under HIPAA…Disclosures [of health information without written au-
thorization] made in the good-faith belief that releasing the health information is necessary to pre-
vent or lessen a serious and imminent threat to public or personal health or safety" is permitted.
[Filing No. 82-18 at 92.]

and he suffered a tangible injury as a result of the disclosure." *Shoun v. Best Formed Plastics, Inc.*, 28 F.Supp.3d 786, 788-89 (N.D. Ind. 2014). As one district court explained:

> Section 12112(d)'s confidentiality requirement balances [the employer's interest in obtaining information so as to accommodate the employee's disability and the employee's interest in keeping medical records confidential] by ensuring that the information disclosed pursuant to an employer's medical inquiry spreads no farther than necessary to satisfy the legitimate needs of both employer and employee.

*Doe v. U.S. Postal Service*, 317 F.3d 339, 344 (C.A. D.C. 2003).[7]

The Court finds that, based on the record evidence, Taghleef did not violate §12112(d)(4)(C) when Ms. LeCour disclosed Mr. Foos' medical records to his supervisors. The evidence – which Mr. Foos does not contradict with record evidence – indicates that Ms. LeCour was concerned for the safety of Mr. Foos and his co-employees when she disclosed his medical records. Specifically, she was concerned that Mr. Foos' diagnosis of alcoholic pancreatitis and his recent involvement in a bar fight might indicate that he had an issue with alcohol consumption and might be arriving to work impaired. [*See, e.g.*, Filing No. 82-5 at 24-27.] These factors, coupled with the dangerous nature of his job, led her to disclose his medical records to limited members of Taghleef management so that they could determine whether further action should be taken. The Court finds that her disclosure falls within the exception to § 12112 for disclosure to "supervisors and managers…regarding necessary restrictions on the work or duties of the employee…." 42 U.S.C. § 12112(d)(3)(B)(i). Taghleef is entitled to judgment as a matter of law on Mr. Foos' § 12112(d)(4)(C) claim.

---

[7] Mr. Foos need not show that he was disabled or perceived as disabled to assert his claims under § 12112(d). *See, e.g.*, *Wright v. Illinois Dept. of Children and Family Services*, --- F.3d ----, 2015 WL 4863400, *6 (7th Cir. 2015) ("All employees, regardless of whether they have a qualifying disability under the ADA, are protected under [42 U.S.C. § 12112(d)]").

b.   § 12112(d)(4)(A) - Administration of Breath Alcohol Test

Mr. Foos brings his ADA claim related to the breath alcohol test under 42 U.S.C. § 12112(d)(4), which provides in relevant part that:

(A) Prohibited examinations and inquiries

A covered entity shall not require a medical examination and shall not make inquiries of an employee as to whether such employee is an individual with a disability or as to the nature or severity of the disability, unless such examination or inquiry is shown to be job-related and consistent with business necessity.

(B) Acceptable examinations and inquiries
A covered entity may conduct voluntary medical examinations, including voluntary medical histories, which are part of an employee health program available to employees at that work site.  A covered entity may make inquiries into the ability of an employee to perform job-related functions.

42 U.S.C. § 12112(d).

Taghleef bears the burden of establishing that the breath alcohol test was "consistent with business necessity…[and] must 'show that the asserted 'business necessity' is vital to the business,' as opposed to a 'mere expediency.'"  *Wright v. Illinois Dept. of Children and Family Services*, --- F.3d ----, 2015 WL 4863400, *6 (7th Cir. 2015) (citing *Thomas v. Corwin*, 483 F.3d 516, 527 (8th Cir. 2007) and *Conroy v. New York State Dep't of Corr., Servs.*, 333 F.3d 88, 97 (2d Cir. 2003)).  This requires Taghleef to show that the business necessity was vital to its business, that the medical examination will genuinely serve that interest, and that the examination is a "reasonably effective method of achieving" that goal.  *Wright*, 2015 WL 4863400 at *6 (quoting and citing *Conroy*, 333 F.3d at 98).  Taghleef must also provide "significant evidence that could cause a reasonable person to inquire as to whether an employee is still capable of performing his job."  *Wright*, 2015 WL 4863400 at *6 (citing *Sullivan v. River Valley Sch. Dist.*, 197 F.3d 804, 811 (6th Cir. 1999)); *see also Conroy*, 333 F.3d at 98 ("courts will readily find a business necessity…when the employer can identify legitimate, nondiscriminatory reasons to doubt the employee's capacity

to perform his or her duties"). The employer's standard practice regarding medical examinations is "certainly relevant evidence of what is 'necessary,'" and so is "an employer's differential application of a medical examination requirement." *Wright*, 2015 WL 4863400 at *6 (quoting *Tice v. Centre Area Transp. Authority*, 247 F.3d 506, 518 (3d Cir. 2001)).

Much like his disclosure-related claim, the Court finds that Mr. Foos' claim related to the breath alcohol test does not fit within this provision of the ADA. The provision prohibits medical examinations related to whether an individual is disabled or to the nature or severity of the disability. 42 U.S.C. § 12112(d)(4)(A). Taghleef did not require Mr. Foos to submit to the breath alcohol test to determine whether he was disabled or to determine the extent of his disability. Rather, the breath alcohol test in Mr. Foos' case was to determine whether he was arriving to work impaired. Accordingly, the breath alcohol test, as administered to Mr. Foos, was not a "prohibited examination" under 42 U.S.C. § 12112(d)(4)(A).

Further, and in any event, the breath alcohol test would fall under § 12112(d)(4)(A)'s exception for examinations or inquiries which are "shown to be job-related and consistent with business necessity." *Id.* As discussed more fully below, Taghleef required Mr. Foos to take the breath alcohol test because it was concerned after learning of his diagnosis of alcoholic pancreatitis and his recent involvement in a bar fight that Mr. Foos could not safely perform his job duties. [*See, e.g.*, Filing No. 82-15 at 17-18.] The Court finds the evidence Taghleef presented sufficient to show that a reasonable employer would have inquired into Mr. Foos' ability to perform his job. *See Coffman v. Indianapolis Fire Dep't*, 578 F.3d 559, 565 (7th Cir. 2009) (employer may inquire into employee's ability to perform job-related functions "when an employer has a reasonable belief based on objective evidence that a medical condition will impair an employee's ability to perform

- 23 -

essential job functions or that the employee will pose a threat due to a medical condition"). Taghleef also presented evidence, uncontradicted by Mr. Foos, that it applied its drug and alcohol policy to other employees that it suspected were arriving to work impaired.  [*See* Filing No. 83 at 11-13.]  In short, Taghleef has presented sufficient evidence, uncontradicted by evidence presented by Mr. Foos, to show that requiring Mr. Foos to submit to the breath alcohol test was consistent with business necessity, served that interest, and was reasonably tailored to achieve that goal.  Accordingly, Taghleef is entitled to judgment as a matter of law on Mr. Foos' § 12112(d)(4)(A) claim.

### 2.  *Discrimination Claim Under § 12112(a)*

The ADA prohibits discrimination "against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a).  Under the ADA, employers may not discriminate against employees that have either actual disabilities, *id.* § 12102(1)(A), or perceived disabilities, *id.* § 12102(1)(C).  *See Ragan v. Jeffboat, LLC*, 149 F.Supp.2d 1053, 1062-63 (S.D. Ind. 2001) (explaining that the ADA prohibits discrimination against employees with both "actual disabilit[ies]" and "perceived disabilit[ies]").

A plaintiff may prove an ADA claim under the direct method or the indirect method.  *See Dickerson v. Bd. of Trustees of Community College Dist. No. 522*, 657 F.3d 595, 601 (7th Cir. 2011).  "Under the indirect method of proof, a plaintiff must first establish a prima facie case of discrimination by showing that (1) he is disabled under the ADA; (2) he was meeting his employer's legitimate employment expectations; (3) he suffered an adverse employment action; and (4) similarly situated employees without a disability were treated more favorably."  *Id.* (citing *Lloyd v. Swifty Transp., Inc.*, 552 F.3d 594, 601 (7th Cir. 2009)).  "Once a plaintiff has established

a prima facie case, the defendant must identify a legitimate, non-discriminatory reason for its employment decision." *Dickerson*, 657 F.3d at 601 (citing *Rooney v. Koch Air, LLC*, 410 F.3d 376, 381 (7th Cir. 2005)). "If the defendant satisfied this requirement, the plaintiff must then prove by a preponderance of the evidence that the defendant's reasons are pretextual." *Dickerson*, 657 F.3d at 601 (citing *Lloyd*, 552 F.3d at 601).

a.   <u>Whether Taghleef Perceived Mr. Foos as Disabled</u>

Mr. Foos must show he was either disabled or that Taghleef perceived him as disabled in order to assert a discrimination claim under § 12112(a).  *See Ragan*, 149 F.Supp.2d at 1062-63. Mr. Foos' counsel confirmed at the hearing that he is not claiming he was disabled, but rather that Taghleef regarded him as disabled.  Mr. Foos' theory regarding the nature of the perceived disability, however, has been somewhat of a moving target.  In his briefs, Mr. Foos refers to the disability Taghleef perceived him as having as "pancreatitis" or "alcoholic pancreatitis."  [*See* Filing No. 73 at 16-17.]  At the hearing, however, Mr. Foos' counsel first stated that Mr. Foos' perceived disability was alcoholism. The Court then questioned whether that argument appeared in his briefs. Counsel then recanted, acknowledging that he had previously argued alcoholic pancreatitis.  By making the argument that his perceived disability was alcoholism for the first time at the hearing, Mr. Foos has waived that argument.  Accordingly, the Court will only consider whether Taghleef perceived Mr. Foos as disabled due to pancreatitis or alcoholic pancreatitis.

In response to Mr. Foos' argument that Taghleef perceived him as disabled, Taghleef asserts that "disabled" for purposes of receiving short-term disability or FMLA benefits, which Ms. LeCour discussed in her deposition, is not the same as "disabled" under the ADA.  [Filing No. 83 at 27.]  Taghleef argues that Mr. Foos only points to his past hospitalizations, and that "[a] period

of hospitalization and recuperation for an acute condition is wholly unrelated to major life activities and is temporary by nature." [Filing No. 83 at 29.]

The parties do not address the issue of whether Taghleef perceived Mr. Foos as disabled in their reply briefs.

Mr. Foos' briefing on this issue is a bit haphazard. He argues that his pancreatitis was a disability because Taghleef approved his FMLA leave requests and authorized disability benefits for that condition. [Filing No. 73 at 16-18.] But, as noted above, Mr. Foos clarified at the September 11 hearing that he was only arguing Taghleef perceived him as disabled, and not that he was actually disabled. The only argument Mr. Foos sets forth in his briefs relating to whether Taghleef perceived him as disabled is that "Taghleef assumed Foos would come to work impaired or under the influence of alcohol based exclusively on the diagnosis of alcoholic pancreatitis. Taghleef perceived Foos as disabled as a result of his medical diagnosis." [Filing No. 73 at 18-19.]

Again, the Court will endeavor to make sense of Mr. Foos' arguments. First, to the extent Mr. Foos does claim that Taghleef perceived him as disabled based on its grant of his FMLA requests and authorization of disability benefits, the Court rejects that argument. Mr. Foos has not set forth any authority to support that proposition and, indeed, the standards for "disability" within the meaning of disability benefits and "disability" within the meaning of the ADA are quite different. The receipt of short term disability benefits does not automatically indicate that an employer perceived an employee as disabled for purposes of the ADA. *See Wellman v. DuPont Dow Elastomers, L.L.C.*, 739 F.Supp.2d 665, 673 (D. Del. 2010) ("Merely having knowledge of the impairment [which led to short term disability leave]…is insufficient to suggest that the employer considered or perceived the employee as disabled"); *Berry v. T-Mobile, USA, Inc.*, 490 F.3d 1211, 1219 (10th Cir. 2007) ("[Defendant's] approval of [plaintiff's] FMLA request does not establish a

- 26 -

question of fact.  An employer's knowledge of an impairment alone is insufficient to establish the employer regarded the employee as disabled [for purposes of an ADA claim]").

As to Mr. Foos' argument that his medical diagnosis caused Taghleef to assume Mr. Foos would come to work impaired and therefore indicates that Taghleef perceived him as disabled, simply showing that an employer is aware of a medical diagnosis is not enough to show that the employer perceived the employee as disabled.  *See, e.g.*, *Carruthers v. BSA Advertising, Inc.*, 357 F.3d 1213, 1217 (11th Cir. 2004) (fact that employer was aware of employee's medical diagnosis, even when combined with other evidence, was not enough to show that employer perceived employee was disabled).  And in any event, Taghleef was concerned that Mr. Foos would be unable to perform his job due to arriving to work under the influence of alcohol, not due to his diagnosis of alcoholic pancreatitis.  The Court concludes that Taghleef did not perceive Mr. Foos as disabled.  Accordingly, Taghleef is entitled to judgment on Mr. Foos' ADA discrimination claim.

Even assuming that Mr. Foos could show that Taghleef perceived him as having some sort of disability (*e.g.*, alcoholic pancreatitis, or even alcoholism), Mr. Foos' claim still fails under either the direct or indirect methods of proof.  Mr. Foos stated at the hearing that his discrimination claim under § 12112(a) is based on two alleged adverse employment actions – the disclosure of his medical records and the administration of the breath alcohol test.[8]  The Court considers each theory in turn.

---

[8] Mr. Foos does not allege that his actual termination violated the ADA, but rather only claims that the use of his medical information for the purpose of deciding to subject him to the breath alcohol test, and the actual breath alcohol test, were the adverse actions taken by Taghleef.  [*See* Filing No. 64 at 1-2.]

b.  Disclosure of Medical Records[9]

### i.  Direct Method

Mr. Foos argues that he can prove his ADA discrimination claim related to the disclosure of his medical records under the direct method because Ms. LeCour "admits that she shared the [medical] information with organizational leadership with the intent of subjecting [him] to a drug and alcohol test, which she acknowledged was an employment-related action," and that Taghleef forced him to take the breath alcohol test "based exclusively on assumptions it drew from his medical diagnosis and prior exercise of his statutory rights."  [Filing No. 73 at 20-23.]

Taghleef responds that disclosure of Mr. Foos' medical records within the company to his supervisors did not violate the ADA, and that Ms. LeCour's disclosure of Mr. Foos' medical information was based on her concern for safety.  [Filing No. 83 at 35-37.]  Mr. Foos and Taghleef reiterate their arguments in their reply briefs.  [Filing No. 84 at 10-11; Filing No. 87 at 8-10.]

Under the direct method of proof for an ADA discrimination claim, Mr. Foos must "offer evidence from which an inference of discriminatory intent can be drawn, such as: '(1) suspicious timing; (2) ambiguous statements or behavior towards other employees in the protected group; (3) evidence, statistical or otherwise, that similarly situated employees outside of the protected group systematically receive better treatment; and (4) evidence that the employer offered a pretextual reason for an adverse employment action.'" *Teruggi v. CIT Group/Capital Finance, Inc.*, 709 F.3d 654, 659-60 (7th Cir. 2013) (quoting *Dickerson v. Bd. of Trs. Of Cmty. Coll. Dist. No. 522*, 657 F.3d 595, 601 (7th Cir. 2011)).  Mr. Foos can rely on several of these types of evidence to present

---

[9] The court has previously found that Mr. Foos did not properly exhaust his administrative remedies with respect to the disclosure of the information within his medical records, and that even if he had exhausted, the disclosure did not violate 42 U.S.C. § 12112(d)(4)(C).

a "'convincing mosaic' of circumstantial evidence" that leads to a "reasonable inference of dis-criminatory intent." *Teruggi*, 709 F.3d at 660 (quoting *Rhodes v. Ill. Dep't of Transp.*, 359 F.3d 498, 504 (7th Cir. 2004)).  Direct evidence, to be convincing, "must point directly to a discrimina-tory reason for the employer's action…and be directly related to the employment decision." *Dass v. Chi. Bd. of Educ.*, 675 F.3d 1060, 1071 (7th Cir. 2012).

The only direct evidence Mr. Foos attempts to set forth in support of his ADA discrimina-tion claim based on the disclosure of his medical records is his assertion that Ms. LeCour "admits that she shared the information with organizational leadership with the intent of subjecting [Mr.] Foos to a drug and alcohol test…." [Filing No. 73 at 21.]  Mr. Foos argues that Ms. LeCour "admits to initiating at least three alcohol-related terminations based on trends in FMLA/[short-term disability] leave and/or confidential medical information," and cites to an email Ms. LeCour sent to Mr. Jackson.  [Filing No. 70-1 at 140-41.]  The email speaks for itself, and Mr. Foos' characterization is inaccurate.  In the email, Ms. LeCour stated that she had alerted Mr. Mauer regarding another employee when she "saw a trend in his [short-term disability]/FMLA use [and] a[n] accidental fall on New Year's [E]ve resulting in fractured ribs for 2 years in a row," and that she had alerted Mr. Mauer when she "received information from [Mr. Foos'] doctor regarding his chronic alcohol abuse [and he] had recently suffered a broken jaw from a bar fight."  [Filing No. 73 at 22 (discussing and quoting Filing No. 70-1 at 141).]  The email indicates that Ms. LeCour contacted Mr. Mauer after observations relating to the short-term disability/FMLA leave of Mr. Foos and one other employee.  It does not show that Ms. LeCour "initiated at least three alcohol-related terminations," nor that she had a propensity to subject individuals who had used short-term disability or FMLA leave to higher scrutiny.

- 29 -

Further, the undisputed evidence indicates that Ms. LeCour was actually motivated to disclose Mr. Foos' medical records to his supervisors because she was concerned about safety. [*See, e.g,.* Filing No. 82-5 at 24 ("Q: All right. So, when we talk about 'the content', we talk about the fact that he was diagnosed with acute alcoholic pancreatitis. A: Correct. Q: You told that to Bryan Jackson. A: I did. Q: And for what reason? A: Out of concern for safety. Q: And what were your specific safety concerns? A: That if alcohol is contributing to his diagnosis, that he may be drinking too much and may be drinking at work"); Filing No. 82-5 at 27 ("Q: What was the purpose of you going to Bryan Jackson? A: To share my concerns about safety. Q: And your concern about safety was that you felt that Mr. Foos may be reporting to work under the influence of alcohol. A: Yes.").] Mr. Foos simply has not presented any direct evidence that Taghleef discriminated against him based on a disability when Ms. LeCour disclosed his medical records to other Taghleef employees.

### ii. Indirect Method

Mr. Foos also argues that he can prove his ADA discrimination claim based on the disclosure of his medical records under the indirect method of proof. He argues that he was subjected to the adverse employment action of having his medical records disclosed, and that the wrongful disclosure led to the drug and alcohol test and, ultimately, his termination. [Filing No. 73 at 24-26.]

In response, Taghleef argues that Ms. LeCour's disclosure of Mr. Foos' medical information did not constitute an adverse employment action. [Filing No. 83 at 33-34.] It also asserts that Mr. Foos has not presented evidence showing that he was meeting Taghleef's legitimate employment expectations, nor that Taghleef treated a similarly situated nondisabled employee better than it treated Mr. Foos. [Filing No. 83 at 40-41.] The parties do not specifically address whether this claim survives under the indirect method of proof in their reply briefs.

It is Mr. Foos' burden under the indirect method of proof to establish a prima facie case of discrimination by showing that: "(1) [he] is disabled under the ADA; (2) [he] was meeting [his] employer's legitimate employment expectations; (3) [he] suffered an adverse employment action; and (4) similarly situated employees without a disability were treated more favorably." *Cloe v. City of Indianapolis*, 712 F.3d 1171, 1182 (7th Cir. 2013). "Once a plaintiff has established a prima facie case, the defendant must identify a legitimate, non-discriminatory reason for its employment decision." *Dickerson v. Board of Trustees of Community College Dist. No. 522*, 657 F.3d 595, 601 (7th Cir. 2011). "If the defendant satisfies this requirement, the plaintiff must then prove by a preponderance of the evidence that the defendant's reasons are pretextual." *Id.*

Mr. Foos' claim related to the disclosure of his medical records does not succeed under the indirect method for several reasons. First, Mr. Foos has not shown that the disclosure was an adverse employment action. Mr. Foos argues that this is so because the disclosure "ultimately resulted in the drug and alcohol testing and [his] termination…." [Filing No. 73 at 26.] But Mr. Foos conveniently ignores the significant intervening factor in his proposed chain of events – that he tested positive for alcohol consumption, in violation of Taghleef's Drug and Alcohol Policy. While the disclosure of his medical records may have triggered Taghleef's safety concerns, it was one factor in Taghleef's decision to require Mr. Foos to undergo the breath alcohol test. Taghleef also considered the fact that Mr. Foos had suffered injuries in a bar fight, and the dangerous nature of his particular position as an Extruder Operator. The disclosure of his medical records may have led to the adverse employment action of his termination, but was not an adverse employment action in and of itself. *See McPherson v. O'Reilly Automotive, Inc.*, 2006 WL 2714941, *7 (W.D. Mo.

- 31 -

2006) (disclosure of employee's medical records to vocational counselor was not an adverse employment action where there was no evidence records were disclosed to potential employers or directly caused a negative consequence).

Additionally, Mr. Foos has not pointed to any similarly situated employee, without a disability, who were treated more favorably by Taghleef.  He argues that "[n]o other Taghleef employee was required to take a drug and alcohol test based on his/her confidential medical information and/or prior FMLA or [short-term disability] leave," [Filing No. 73 at 24], yet he does not provide any citation to record evidence which supports that assertion.  Citation to the record is required on summary judgment, *Johnson*, 325 F.3d at 898-99, and the Court will not consider Mr. Foos' assertions that are not supported by such citation.

Finally, if Mr. Foos were able to set forth a prima facie case of ADA discrimination related to the disclosure of his medical records under the indirect method, his claim would still fail because Taghleef has proffered a non-discriminatory reason for the disclosure and Mr. Foos has not presented any evidence that the reason was pretextual.  Specifically, the evidence shows that Ms. LeCour disclosed Mr. Foos' medical records because she was concerned about safety, and that there could be negative and dangerous consequences if Mr. Foos were arriving to work impaired due to alcohol consumption.  [*See, e.g.*, Filing No. 82-5 at 24; Filing No. 82-5 at 27.]  Mr. Foos has not presented any evidence that Ms. LeCour's concern for safety was not the real reason she disclosed Mr. Foos' medical records to his supervisors.

Mr. Foos' ADA discrimination claim related to the disclosure of his medical records fails because he did not exhaust his administrative remedies related to that claim, and fails as a matter of law under both the direct and indirect methods of proof.  Accordingly, Taghleef is entitled to summary judgment on that claim.

- 32 -

c.  Administration of Breath Alcohol Test

**i.  Direct Method**

As direct evidence of his ADA discrimination claim related to administration of the breath alcohol test, Mr. Foos argues that "not all employees who return from FMLA and/or short-term disability leave are subjected to drug and alcohol testing."  He then points to evidence that he argues shows Ms. LeCour had a "propensity to subject employees who exercise their statutorily protected rights to greater scrutiny than employees who do not exercise those rights, by reviewing their medical diagnoses and trends in [short-term disability]/FMLA use in order to initiate alcohol related terminations."  [Filing No. 73 at 21-22.]  Mr. Foos also points to deposition testimony that he argues shows that the decision to administer the breath alcohol test was made while he was still on leave, and that no one at Taghleef had "reasonable suspicion" that he was impaired or under the influence of alcohol when he returned to work.  [Filing No. 73 at 22-23.]

Taghleef responds that the timing of its decision to test Mr. Foos for alcohol consumption[10] was not suspicious, but rather was due to "legitimate safety concerns on the part of his supervisors based on recently received information."  [Filing No. 83 at 38.]  It argues that the timing was consistent with company policy, and also asserts that Mr. Foos has not pointed to any ambiguous statements or favorable treatment of employees outside of the protected class.  [Filing No. 83 at 38-39.]  Taghleef also argues that Mr. Foos has not presented any evidence of pretext.  [Filing No. 83 at 39.]

---

[10] Taghleef also argues that the timing of its decision to terminate Mr. Foos was not suspicious, but the Court finds that Mr. Foos has not alleged a claim for ADA discrimination based on his termination – but only on Ms. LeCour's release of his medical information, and on Taghleef's decision to require Mr. Foos to undergo drug and alcohol testing.  Accordingly, it will not consider arguments related to Mr. Foos' ultimate termination in the context of his ADA discrimination claims.

On reply, Mr. Foos argues that Taghleef did not follow its own Employee Handbook in subjecting him to the breath alcohol test, and that such a failure can be evidence of discrimination. [Filing No. 84 at 7-9.]  He asserts that Taghleef did not have reasonable suspicion to subject him to the test, and that if Taghleef believed he could not safely perform his job duties, it would not have authorized the end of the short-term disability leave.  [Filing No. 84 at 11-12.]

In its reply, Taghleef contends that its decision to subject Mr. Foos to the breath alcohol test complied with its Employee Handbook and policies and procedures.  [Filing No. 87 at 5.]

The evidence Mr. Foos claims is direct – that Taghleef decided to require him to take the breath alcohol test while he was still on leave and subjected him to the test his first day back, and that Taghleef did not have reasonable suspicion that he was impaired and, therefore, violated its Employee Handbook by requiring the test – does not support Mr. Foos' ADA discrimination claim under the direct method.  First, the undisputed evidence shows that the decision to subject Mr. Foos to the breath alcohol test was based on his medical provider's diagnosis that he had alcoholic pancreatitis, and on his earlier injury during a bar fight.  [See Filing No. 82-5 at 24-25; Filing No. 82-15 at 13-17.]  These facts were known to Taghleef before Mr. Foos returned to work, so it is not suspicious that Taghleef would have made the decision to test him at that time.  Additionally, the timing of the decision to administer the breath alcohol test on Mr. Foos' first day back is con-sistent with Taghleef's stated purpose of maintaining workplace safety.  If Taghleef believed that Mr. Foos might be coming to work impaired – which, it turned out, he was – then the logical time to test him would be his first day back from leave.  This timing is not evidence that Taghleef was discriminating against him for having alcoholic pancreatitis, but rather shows that Taghleef was concerned that Mr. Foos might arrive at work impaired.

Further, the evidence does not indicate that Taghleef violated its own Employee Handbook or policies and procedures.  Mr. Foos focuses only on the portion of the Employee Handbook which allows Taghleef to require an employee to undergo a breath alcohol test "if there is evidence based 'reasonable suspicion' that an employee's performance is impaired by drugs or alcohol." [Filing No. 70-1 at 290.]  He argues that no one at Taghleef personally observed him acting in a way that would indicate he was impaired, but rather assumed he might be impaired based on his physical condition.  [Filing No. 84 at 7-8.]  Mr. Foos ignores another provision in the Employee Handbook however, which provides that:

> Strict adherence to the Handbook is to never get in the way of decisions based upon good business judgment.  While consistent interpretation of Handbook provisions is desirable, Organization Leadership and Human Resources evaluates situations and document[s] decisions on a case-by-case basis where deviations are in the best interest of [Taghleef] and its employees.  All management practices are not expected to be included in the Handbook; however, local management practices are to be generally consistent with this Handbook.

[Filing No. 70-1 at 166.]

Even assuming that Taghleef did not have the type of "reasonable suspicion" discussed in the Employee Handbook to warrant testing Mr. Foos,[11] Taghleef's requirement that Mr. Foos submit to the breath alcohol test was consistent with this catch-all provision in the Employee Handbook.  The undisputed evidence indicates that Taghleef was concerned with safety, and the test was administered to ensure that Mr. Foos was not coming to work impaired.  [*See, e.g.*, Filing No. 82-15 at 17-18 (Q: Was that decision [to require the breath alcohol test] based on facts – any other facts aside from the diagnosis and the fact that he had been involved in the bar fight?  A:  The

---

[11] The Court does not find Taghleef's approval of the end of Mr. Foos' leave to be inconsistent with its concern that he might arrive to work impaired due to alcohol consumption.  This approval was based on Mr. Foos' medical provider's opinion.  Whether he would then arrive to work impaired was a separate issue.  Under Mr. Foos' theory, Taghleef would have to allow him to remain on FMLA/short-term disability leave forever if it suspected that he might return to work impaired.

decision to test was based upon our concern that the employee may be coming to work under the influence of alcohol….Q: We talked about the fact that you had concern that [Mr. Foos] may be showing up for work under the influence of alcohol.  A: Yes. Q: Now, is your concern one of safety for [Mr. Foos] and his coemployees? A: Yes. Q: So you feel that, if he is showing up to work under the influence of alcohol, that he would be unable to safely perform his job duties.  A: That would be a concern.  Q: And is performing his job duties safely an essential function of his job? A: Yes.").]  This concern justified Taghleef's actions in requiring Mr. Foos to take the breath alcohol test.  *See Miller v. Champaign Community Unit School Dist.*, 983 F.Supp. 1201, 1206 (C.D. Ill. 1997) ("In this case the 'job-related or business necessity' language of § 12112(d)(4) exonerates the school district from all forms of ADA liability.  Since the psychiatric examination was job-related, it necessarily cannot be the result of either direct discrimination or discrimination based on improper assessment or 'regarding' [plaintiff] as having a disability").

And, in any event, deviation from the "reasonable suspicion" provision in the Employee Handbook is not direct evidence of discrimination.  *See Kohls v. Beverly Enterprises Wisconsin, Inc.*, 259 F.3d 799, 806 (7th Cir. 2001) ("[plaintiff] is correct that [defendant] did not follow the discipline and counseling procedures set forth in its written discipline policy….However, as noted above, the procedures outlined in [defendant's] policy were only a guide and did not have to be followed in all instances.  It was in the discretion of the executive director…to terminate [plaintiff] on the spot rather than initiate the formal process.  As we have stated  many times, our role is not to make suggestions to managers on how to deal with employees more fairly or effectively – we leave that to a company's personnel department"); *Dale v. Chicago Tribune Co.*, 797 F.2d 458, 464 (7th Cir. 1986) ("This Court does not sit as a super-personnel department that reexamines an entity's business decisions").

In short, Mr. Foos has not presented direct evidence that Taghleef discriminated against him based on his alcoholic pancreatitis by requiring him to submit to a breath alcohol test upon his return from FMLA leave.  The Court will now consider whether Mr. Foos can sustain his burden of proof under the indirect method.

## ii.  Indirect Method

Mr. Foos argues that requiring him to submit to the breath alcohol test "after he was released to return to work without restrictions" is an adverse employment action.  [Filing No. 73 at 24.]  He asserts that because he was released to return to work without restrictions, his breath alcohol test was not performed in a routine manner.  [Filing No. 73 at 27.]  He states that 42 U.S.C. § 12112(d)(4)(A) "arguably makes a medical examination for purposes of ascertaining whether an employee is an individual with a disability or as to the nature or severity of the disability a *de facto* adverse employment action, unless the employer can show the examination is job-related and consistent with a business necessity."  [Filing No. 73 at 26 (emphasis in original).]

Taghleef responds that the breath alcohol test did not constitute an adverse employment action because it was not conducted to humiliate or harass Mr. Foos, but rather was conducted in a routine fashion, consistent with Taghleef's practices, and consistent with business necessity.  [Filing No. 83 at 33.] Taghleef argues that Mr. Foos has not presented any evidence that a similarly situated employee outside of his protected class was treated more favorably than he was.  [Filing No. 83 at 40-41.]  Taghleef also notes that Mr. Foos has not met his burden of showing pretext.  [Filing No. 83 at 41.]

On reply, Mr. Foos argues that Taghleef's stated reason of promoting safety by requiring him to submit to a breath alcohol test is "illogical" because he had been cleared to safely perform

all essential job functions and Taghleef would not have authorized the end of his short-term disability leave if it believed he could not safely perform his job functions.  [Filing No. 84 at 12.]

In its reply, Taghleef reiterates its arguments that Mr. Foos has not presented evidence of similarly situated employees being treated more favorably, and that safety is a matter of business necessity and was the reason Taghleef required him to submit to the breath alcohol test.  [Filing No. 87 at 7.]

Mr. Foos has not established a prima facie case of ADA discrimination related to the breath alcohol test for at least two reasons – he has not shown either that he suffered an adverse employment action, or that similarly situated employees without a disability were treated more favorably. As to whether subjecting an employee to a drug or alcohol test is an adverse employment action, the Seventh Circuit Court of Appeals has instructed that a drug test is an actionable adverse employment action "only if the test 'is not performed in a routine fashion following the regular and legitimate practices of the employer, but [rather] is conducted in a manner that harasses or humiliates employees….'"  *Keys v. Foamex, L.P.*, 264 Fed. Appx. 507, 510 (7th Cir. 2008) (quoting *Stocket v. Muncie Ind. Transit Sys.*, 221 F.3d 997, 1001-02 (7th Cir. 2000)).  The Court has already found that Taghleef's requirement that Mr. Foos submit to a breath alcohol test did not violate its own policies as set forth in the Employee Handbook, especially given the Employee Handbook's catch-all provision and the importance of a safe working environment.  To the extent that Mr. Foos claims that Taghleef conducted the breath alcohol test in a harassing or humiliating manner, he has not presented any evidence that this was the case.  Indeed, the undisputed evidence shows that only Ms. LeCour, the Taghleef management that made the decision to require Mr. Foos to take the breath alcohol test – Mr. Jackson, Mr. Mauer, Mr. Buck, Taghleef's General Counsel, and Mr. McKee – and the individual who administered the test were aware that Mr. Foos was being tested.

Mr. Foos has not pointed to evidence indicating that the manner in which the test was administered was somehow humiliating or embarrassing.

Further, Mr. Foos has not pointed to any similarly situated employees, without a disability, who were treated better than he was. On the other hand, Taghleef submits evidence of other employees without disabilities who were sent for medical testing "based upon reasonable suspicion of alcohol intoxication based on their behavior outside of work and information provided by third parties," and who did not have any "indication of traditionally articulated signs of intoxication." [Filing No. 83 at 11-12.] The other employees had all previously taken FMLA leave as well. [Filing No. 83 at 12-13.]

In sum, Mr. Foos has not set forth either direct evidence of ADA discrimination, or evidence demonstrating a prima facie case of discrimination because he has not shown that subjecting him to the breath alcohol test was an adverse employment action, and because he has not presented evidence that Taghleef treated similarly situated employees more favorably. Mr. Foos' ADA discrimination claim based on Taghleef's requirement that he undergo a breath alcohol test upon his return from FMLA leave fails as a matter of law.

**B. FMLA Retaliation Claim**

Mr. Foos argues that Taghleef retaliated against him for taking FMLA leave by disclosing his medical information, requiring him to take a breath alcohol test, and terminating him.[12] Similar

---

[12] To the extent that Mr. Foos attempts to assert a claim for FMLA interference, that claim fails as a matter of law. To prevail on an FMLA interference claim, Mr. Foos would need to show that: "(1) [he] was eligible for the FMLA's protections; (2) [his] employer was covered by the FMLA; (3) [he] was entitled to take leave under the FMLA; (4) [he] provided sufficient notice of [his] intent to take leave; and (5) [his] employer denied [him] FMLA benefits to which [he] was entitled." *Makowski v. SmithAmundsen LLC*, 662 F.3d 818, 825 (7th Cir. 2011). It is undisputed that Taghleef granted Mr. Foos' FMLA leave request every time he made such a request. Accordingly, he cannot satisfy the last element of an FMLA interference claim and Taghleef is entitled to summary judgment to the extent Mr. Foos asserts such a claim.

to an ADA discrimination claim, a plaintiff asserting an FMLA retaliation claim may proceed under either the direct or indirect methods of proof. *James v. Hyatt Regency Chicago*, 707 F.3d 775, 781 (7th Cir. 2013). The Court addresses each method of proof below.

### 1. Direct Method

Mr. Foos asserts that his FMLA retaliation claim succeeds under the direct method because he was engaged in a statutorily protected activity when he applied for FMLA leave, he suffered a materially adverse employment action, and a causal connection exists between the two. [Filing No. 73 at 28.] The extent of his argument in his opening brief regarding the direct method of proof for his FMLA retaliation claim is that "LeCour became aware of Foos' diagnosis of acute alcoholic pancreatitis only through her role as the Health and Wellness Manager for Taghleef. LeCour used her position to access confidential employee medical information, including but not limited to patterns of FMLA/[short-term disability] leave and medical diagnoses, to identify employees she assumed had alcohol-related illnesses. She then shared that confidential medical information with organizational leadership in order to initiate the termination of those employees. LeCour's December 10, 2013 email to Bryan Jackson clearly establishes her retaliatory or discriminatory animus." [Filing No. 73 at 28-29.]

Taghleef responds that neither the disclosure of medical information nor requiring the breath alcohol test were materially adverse actions, and that Mr. Foos cannot show there is a causal connection between his FMLA leave and his termination. [Filing No. 83 at 42.] Taghleef also argues that Mr. Foos has not presented evidence of a causal connection between his FMLA leave and his termination, or any evidence indicating that Taghleef's stated reason for terminating him was a pretext for discrimination. [Filing No. 83 at 43-44.]

- 40 -

In his reply, Mr. Foos argues that Ms. LeCour deviated from the Employee Handbook when she disclosed his confidential medical records, that this constituted an adverse employment action, and that "[t]he evidence clearly establishes that employees who exercised their statutory rights to FMLA/[short-term disability] leave were being subjected to scrutiny from LeCour." [Filing No. 84 at 22.]

Taghleef argues on reply that Mr. Foos' FMLA leave had nothing to do with Taghleef's decision to terminate him – rather, the decision to terminate him was based on the results of the breath alcohol test. [Filing No. 87 at 11-12.] It also notes that Mr. Foos arrived at work intoxicated on the day he was tested, and that he "fails to point to any other employee who tested above the legal limit and who was not terminated." [Filing No. 87 at 11.]

For Mr. Foos' FMLA retaliation claim to succeed under the direct method of proof, Mr. Foos must show that: "(1) [he] engaged in activity protected by the FMLA, (2) [his] employer took an adverse employment action against [him], and (3) the two were causally connected." *Malin v. Hospira, Inc.*, 762 F.3d 552, 562 (7th Cir. 2014) (citing *Pagel v. TIN Inc.*, 695 F.3d 622, 631 (7th Cir. 2012)). Mr. Foos cannot sustain his burden of proof under any of his theories of FMLA discrimination. Taghleef does not contest that Mr. Foos was engaged in statutorily protected activity when he took FMLA leave. But, as discussed above, neither the disclosure of his medical information nor requiring him to submit to a breath alcohol test are adverse employment actions under these circumstances.

And while termination is an adverse employment action – and even if the disclosure of his medical records and requiring the breath alcohol test were considered adverse employment actions – Mr. Foos has not set forth any evidence that the statutorily protected activity and the adverse

employment actions were causally connected.  He essentially argues that the FMLA leave ulti-mately caused the disclosure of his medical records, administration of the breath alcohol test, and his termination because Ms. LeCour received information regarding his diagnosis of alcoholic pancreatitis through the administration of his FMLA leave claim.  [Filing No. 84 at 19-21.]  But Mr. Foos ignores the intermediate factor that the alcoholic pancreatitis diagnosis (and his previous FMLA leave for injuries sustained in a bar fight) caused Taghleef to be concerned about safety if he should arrive at work impaired.  The information learned because of the FMLA leave caused the concern that led to the disclosure of the medical records and the administration of the breath alcohol test – not the fact that Mr. Foos took the FMLA leave.  And the undisputed evidence further establishes that if Mr. Foos had tested negative, he would immediately be returned to work.  Addi-tionally and significantly, the undisputed evidence indicates that Mr. Foos was terminated because his breath alcohol test indicated a blood-alcohol level of .081 – above the legal limit, and prohibited by Taghleef policy.  Mr. Foos' intoxication, not the fact that he took FMLA leave, ultimately caused his termination.  There simply is no direct evidence that Taghleef retaliated against Mr. Foos for taking FMLA leave.[13]

### 2.  *Indirect Method*

Mr. Foos argues that his FMLA retaliation claim succeeds under the indirect method of proof because "he has shown that but for his exercise of his statutory rights he would not have suffered the materially adverse employment action."  [Filing No. 73 at 32.]

Taghleef responds that Mr. Foos cannot demonstrate that he was meeting Taghleef's legit-imate expectations, nor that he was treated less favorably than similarly situated employees who

---

[13] The Court also notes that Mr. Foos had taken FMLA leave five times before his final leave, his FMLA applications were always approved, and he always returned to his previous position without incident – until he failed the breath alcohol test and was terminated.

did not engage in statutorily protected activity.  [Filing No. 83 at 44-45.]  Taghleef argues that

only his termination was an adverse employment action, and that the evidence shows he was ter-

minated due to the results of his breath alcohol test, and not from the fact that he took FMLA leave.

[Filing No. 83 at 45.]

Mr. Foos replies that the similarly situated employee who was treated more favorably is

himself – that he had been on FMLA leave several times before for the same condition, and was

never subjected to a breath alcohol test upon returning to work.  [Filing No. 84 at 24.]

In its reply, Taghleef cites a Department of Labor Opinion Letter stating that "[n]othing in

the FMLA prohibits an employer from requiring an employee to submit to drug testing once the

employee has returned to work.  Therefore, the employer's actions do not violate the FMLA."

[Filing No. 87 at 11.]  Taghleef reiterates that its decision to terminate Mr. Foos had nothing to do

with his FMLA leave.  [Filing No. 87 at 11-12.]

Under the indirect method of proof, to establish a prima facie case of FMLA retaliation

Mr. Foos must show that he: "(1) engaged in a statutorily protected activity; (2) met [his] em-

ployer's legitimate expectations; (3) suffered an adverse employment action; and (4) was treated

less favorably than similarly situated employees who did not engage in statutorily protected activ-

ity." *Simpson v. Office of Chief Judge of Circuit Court of Will County*, 559 F.3d 706, 718 (7th Cir.

2009).  If Mr. Foos can satisfy the four prima facie elements, then the burden shifts to Taghleef to

set forth a non-discriminatory reason for terminating him.  *Id.*  Again, the parties do not dispute

that Mr. Foos was engaged in a statutorily protected activity when he took FMLA leave.  As the

Court found above, however, the disclosure of Mr. Foos' medical records and subjecting Mr. Foos

to the breath alcohol test were not adverse employment actions, and he has not presented evidence

that Taghleef treated similarly situated employees differently with respect to those actions.  His

FMLA retaliation claims related to the disclosure of his medical records and requiring him to submit to the breath alcohol test fail as a matter of law.

As far as Mr. Foos' FMLA retaliation claim related to his termination, that claim suffers from several fatal flaws as well.  First, Taghleef has set forth evidence that it has terminated eight other employees for violation of the Drug and Alcohol Policy who never took FMLA leave.  [Filing No. 82-25 at 3.]  Mr. Foos' only attempt to point to similarly situated employees who were treated more favorably than him is to argue that he was similarly situated when he returned from his previous FMLA leaves, and was never asked to submit to a breath alcohol test.  But Mr. Foos' argument is fatally flawed because the similarly situated employee must not have engaged in the statutorily-protected activity.  The former Mr. Foos had done so by taking FMLA leave.  Mr. Foos also does not point to any circuit authority standing for the proposition that past, favorable treatment of the plaintiff can constitute proof of discriminatory treatment of that same plaintiff for that same behavior in the future.

In any event, Mr. Foos' claim also fails under the indirect method because Taghleef has set forth an undisputed, non-discriminatory reason for terminating him – that he failed the breath alcohol test in violation of Taghleef's Drug and Alcohol Policy.  Mr. Foos' claim related to his termination fails as a matter of law.

## IV.
### CONCLUSION

In sum, Taghleef is entitled to summary judgment on Mr. Foos ADA claims under § 12112(d)(4)(A) and § 12112(d)(4)(C) because, based on the record evidence, Taghleef did not violate those provisions as a matter of law.  Mr. Foos' ADA discrimination claim under § 12112(a) fails as a matter of law because:

- As to the disclosure of his medical records, Mr. Foos did not exhaust his administrative remedies, it was not an adverse employment action, and he has not presented sufficient evidence under either the direct or indirect methods of proof that Taghleef disclosed his medical information because of a disability, rather than because it was concerned about safety issues; and

- As to the administration of the breath alcohol test, it was not an adverse employment action, and Mr. Foos has not presented sufficient evidence under the direct or indirect methods of proof that Taghleef required him to submit to the breath alcohol test because of a disability, rather than because it was concerned about safety issues.

Taghleef is also entitled to summary judgment on Mr. Foos' FMLA retaliation claims because:

- His claims regarding the disclosure of his medical information and the administration of the breath alcohol test fail under both the direct and indirect methods because they are not adverse employment actions and there is no causal connection between Mr. Foos' FMLA leave and those two events; and

- His claim regarding his termination fails under both the direct and indirect methods because the evidence shows that he was terminated for the results of his breath alcohol test and not for taking FMLA leave, and under the indirect method because he has not presented evidence that similarly situated employees were treated more favorably than he was.

For the foregoing reasons, the Court **DENIES** Mr. Foos' Motion for Summary Judgment, [Filing No. 70], and **GRANTS** Taghleef's Cross-Motion for Summary Judgment, [Filing No. 82]. Final judgment will enter accordingly. The Court also **DENIES AS MOOT** Mr. Foos' Motion to Preclude or Limit Expert Testimony, [Filing No. 91].

Date: September 22, 2015

Hon. Jane Magnus-Stinson, Judge
United States District Court
Southern District of Indiana

**Distribution via ECF only to all counsel of record**